IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
WESTERN DIVISION

| | |
|---|---|
| ESTATE OF HASSIBA BELBACHIR, Deceased, by ABDELKADIR RACHID BELBACHIR, Administrator, Plaintiff, vs. COUNTY OF MCHENRY, et al. Defendants. | Case No. 06 C 01392 Magistrate Judge P. Michael Mahoney |

# MEMORANDUM OPINION AND ORDER

I. Introduction

On May 8, 2007, Plaintiff filed the Motion to Compel which is the subject of this order. The court granted the Motion to Compel in part on May 14, 2007, and invited the parties to brief the remaining issue, concerning whether documents responsive to Plaintiff's Requests to Produce were protected by the Medical Studies Act, 735 ILCS 5/8-2101. Having reviewed the parties' briefs, Defendant's privilege log, and the relevant case law on the subject, the court finds that the Medical Studies Act does not protect the material identified in Defendant's privilege log.

II. Background

According to the Complaint, Hassiba Belbachir was a 27 year Muslim woman of Algerian descent who had been residing in the Chicago area before boarding a plane to London on March 1, 2005. Plaintiff's Amended Complaint at 7. Upon arrival at London's Heathrow

1

Airport, she was taken into custody and detained by British immigration authorities and ultimately placed on a return flight to Chicago one week later. *Id*. at 7-8. Upon arriving at Chicago O'Hare International Airport on March 8th, Ms. Belbachir was taken into custody by U.S. Immigration and Customs Enforcement [herein "ICE"]. *Id*. at 8. She was then detained overnight at the Stone Park Police Department. *Id*. While detained in Stone Park, she became tremulous, shaking, restless, anxious, nauseous and began vomiting. *Id.* She was rushed to a local hospital where she was diagnosed with acute anxiety reaction, acute gastritis, and vomiting. *Id.*

On March 9th, 2005, Ms. Belbachir was transported to the McHenry County Jail, which had a contract with ICE to hold immigration detainees pending the resolution of their immigration status. *Id*. Over the course of the next eight days, Ms. Belbachir experienced various physical and mental health emergencies while detained at the McHenry County Jail, including anxiety and panic attacks, depression, difficulty breathing and suicidal ideation. *Id*. at 9-11. On March 17th, Ms. Belbachir was found dead in her cell with her jail-issued knee socks knotted together around her neck, the victim of an apparent suicide. *Id*. at 12.

On March 14, 2006, Abdelkadir Rachid Belbachir (Hassiba's cousin and the administrator of her estate) brought this case pursuant to: the Civil Rights Act, 42 U.S.C. §1983; the Americans with Disabilities Act, 42 U.S.C. §12131; § 504 of the Rehabilitation Act of 1973, 29 U.S.C. §794; 28 U.S.C. §§1331 & 1343(a); and 28 U.S.C. §1367(a). The complaint also contains various counts rooted in state law, international treaties and conventions.

Centegra Health Systems is one of many named defendants. Pursuant to its contract with the McHenry County Jail, Centegra was the provider of health care services within the jail.

Plaintiff asserts that Centegra "failed and refused to reasonably accommodate Hassiba Belbachir's mental and physical disabilities . . . in violation of Title II of the ADA and/or §504 [of the Rehabilitation Act]." *Id*. at 18. Plaintiff also asserts *Bivens* and *Monell* claims against Centegra, alleging that its "policies, practices, customs and omissions . . . violated Ms. Belbachir's rights to due process under the Fourteenth and Fifth Amendments." *Id*. at 25.

III. Privilege Under the Medical Studies Act

    Section 8/2101 of the Act provides, in relevant part:

> All information . . . of a health care practitioner's professional competence, or other data of . . . committees of licensed or accredited hospitals or their medical staffs, including Patient Care Audit Committees, Medical Care Evaluation Committees, Utilization Review Committees, Credential Committees and Executive Committees, or their designees (but not the medical records pertaining to the patient), used in the course of internal quality control or of medical study for the purpose of reducing morbidity or mortality, or for improving patient care or increasing organ and tissue donation, shall be privileged, strictly confidential and shall be used only for medical research, increasing organ and tissue donation, the evaluation and improvement of quality care, or granting, limiting or revoking staff privileges or agreements for services . . . .

735 ILCS 5/8-2101. The Act further provides that:

> Such information, records, reports, statements, notes, memoranda, or other data, shall not be admissible as evidence, nor discoverable in any action of any kind in any court or before any tribunal, board, agency or person. The disclosure of any such information or data, whether proper, or improper, shall not waive or have any effect upon its confidentiality, nondiscoverability, or nonadmissibility.

735 ILCS 5/8-2102. The idea that "information . . . or other data of . . . committees of licensed or accredited hospitals or their medical staffs . . . used in the course of internal quality control . . . shall be privileged," must be read in light of the wealth of Illinois case law which narrows the otherwise broad scope of the Act. *Id*.

3

The Illinois Supreme Court noted that the legislative debate and case law addressing the Act suggests that a hospital committee "must be involved in the peer-review process before the privilege will attach." *Roach v. Springfield Clinic,* 157 Ill.2d 29, 40, 191 Ill. Dec. 1, 6, 623 N.E.2d 246, 251 (1993). The Illinois Appellate courts have taken up this suggestion, holding that the Act is limited to protecting "the mechanisms of the peer-review process– i.e., information initiated, created, prepared or generated by a peer-review committee." *Berry v. West Suburban Hospital Medical Center*, 338 Ill.App.3d 49, 55, 272 Ill.Dec. 771, 776, 788 N.E.2d 75, 80 (Ill.App.Ct. 2003), *citing Chicago Trust Co. v. Cook County Hospital*, 298 Ill.App.3d 396, 402, 232 Ill.Dec. 550, 698 N.E.2d 641 (Ill.App.Ct. 1998) (reports prepared shortly after an incident which were used by an oversight committee to review the incident were not privileged where the reports were not requested by- and thus did not belong to- a committee engaged in the peer-review process); *Grandi v. Shah*, 261 Ill.App.3d 551, 556, 199 Ill.Dec. 98, 633 N.E.2d 894 (Ill. App. Ct. 1994) (even assuming that a hospital administrator's conversations with a doctor and nurse to investigate a patient complaint were part of the hospital's internal review process, those conversations were not protected because the administrator was not acting on behalf of any peer-review committee.).

The purpose of the Medical Studies Act is to "ensure that members of the medical profession will effectively engage in self-evaluation of their peers in the interest of advancing the quality of health care." *Webb v. Mount Sinai Hosp. and Medical Center of Chicago*, 347 Ill.App.3d 817, 824 (Ill.App.Ct. 2004); *see also Roach*, 157 Ill.2d at 40 ("The statute is premised on the belief that, absent the statutory peer-review privilege, physicians would be reluctant to sit on peer-review committees and engage in frank evaluations of their colleagues."). The Act was

4

never intended to shield hospitals from potential liability, nor does it protect all information used for internal quality control purposes. *Webb,* 347 Ill.App.3d at 825. Documents generated before a peer-review process begins, or after it ends, are not protected. *Webb,* 347 Ill.App.3d at 825.

With the scope of the Medical Studies Act in mind, the court will first determine whether the documents identified in Defendant's privilege log fall under the protection of the Act as the Illinois Courts have framed it. The court will then go on to address the applicability of Illinois' peer-review privilege in this federal case.

IV. Whether Documents Identified in Centegra's Privilege Log Fall Within the Scope of the Act

Before delving in to the various categories of documents identified in Defendant's privilege log, it is necessary to first outline a few key events. Ms. Belbachir died on March 17, 2005. Defendant conducted a "Core Team Meeting" on April 14, 2005. The minutes of the April 14th meeting indicate that those present discussed the chronology of events leading up to Ms. Belbachir's death and the policies and procedures that were employed by Centegra and the jail. Then on May 9, 2005, Defendant conducted a "Root Cause Analysis" meeting. Documents from the May 9th meeting reveal that the team assembled May 9th looked into the circumstances underlying Ms. Belbachir's death and formulated various proposals to prevent this type of event from recurring. With the dates of Ms. Belbachir's death and the resulting meetings in mind, one can better determine the applicability of the Act to the allegedly privileged documents.

A. Documents 1 through 33

Defendant identifies documents Bates Stamped 1 through 33 as "Minutes from Clinical

Performance meetings between January 2004 and June 2005 created pursuant to Centegra Health System's Evaluation of Variances and Level of Severity policy." Defendant's Privilege Log at 1. However, many of these minutes were recorded *before* Ms. Belbachir's death on March 17, 2005. The names of those who participated in these performance meetings are included in the minutes, but Defendant failed to specify whether these people even played a role in reviewing Ms. Belbachir's care. Indeed, Defendant never bothered to specify whether these people are administrators, hospital staff, legal counsel or medical doctors.

Having reviewed documents 1 through 33 in camera, the court is convinced that they have nothing to do with peer-review and were not generated by the committees that met on April 14 and May 9, 2005, for the purpose of reviewing Ms. Belbachir's death. Because documents 1 through 33 contain no information relating to a peer-review process, they fall outside the Act's protection. *See Berry*, 788 N.E.2d at 80 (the Act is limited to protecting "the mechanisms of the peer-review process– i.e., information initiated, created, prepared or generated by a peer-review committee.").

B.  Documents 34 through 44

Document 34 is a memo dated April 26, 2004,[1] from Eileen Barnes, Director of Quality. In this memo, Ms. Barnes scheduled the May 9, 2005, Root Cause Analysis meeting.

---

[1] The date of this memo organizing the May 9, 2005, Root Cause Analysis meeting is apparently a typo. The scheduling of a meeting back in 2004 to discuss a death that took place in 2005 suggests that the memo was actually written on April 26, 2005, not April 26, 2004. This suspicion is confirmed by the subject of the memo: "Root Cause Analysis– HB– Jail." Ms. Barnes was obviously not aware of HB's, Hassiba Belbachir's, death one year before it happened.

Documents 35 through 44 are undated copies of Centegra's sentinel event policies. These policy documents were apparently sent out along with the memo so that the meeting participants could use these policies for guidance.

"To be privileged, information must be generated by, not simply considered during, the peer review process." *Botvinick v. Rush University Medical Center*, No. 06C2054, 2006 WL 3524413 (N.D. Ill. 2006) (stating that information which exists in some nonprivileged form does not become privileged simply because it was placed in front of a committee). Because documents 34 through 44 were not generated in the course of any peer-review process, they also fall outside the Act's protection.

    C. Documents 45 through 47

Documents 45 through 47 are undated, unsigned summaries of events which took place in the jail's Medical Department on three dates: June 17, 2004; March 17, 2005; and August 29, 2005. It is the second of these summaries which outlines Ms. Belbachir's death and the actions taken in response.

Defendant has failed to specify when these summaries were generated, why they were generated, and who they were distributed to. Without knowing this information, the court is unable to determine whether these documents were generated in the course of a peer-review process. Documents 45 through 47 may have been drafted well before any peer-review meeting took place, in which case the privilege is inapplicable. The burden of establishing the applicability of the peer-review privilege rests upon the party seeking to invoke it. *Green v. Lake Forest Hosp.,* 335 Ill.App.3d 134, 136-137, 269 Ill.Dec. 861, 781 N.E.2d 658, 661

(Ill.App.Ct. 2002) (citing *Roach*, 157 Ill.2d at 39-41). Because Defendant has failed to demonstrate that these documents were generated through a peer-review process, they fall outside the Act's protection.

    D. Documents 48 through 65

Documents 48 through 65 are distinct from the other materials considered thus far. Document 48 is comprised of handwritten notes from the Core Team's meeting on April 14, 2005. Document 49 contains the minutes from the April 14th meeting. Document 50 is a memo from Eileen Barnes which was originally attached to documents 51-65. Documents 51-65 are draft "F-O-C-U-S P-D-C-A"[2] documents which were created during the May 9, 2005, Root Cause Analysis meeting.

What is different about these documents is the fact that they were all created *during* the Core Team meeting of April 14, 2005, or *during* the Root Cause Analysis meeting of May 9, 2005. Assuming without deciding that these meetings constituted the kind of peer-review the Act was designed to protect, material developed in the course of these meetings falls squarely within the scope of the Act's protection. The court will address documents 48 through 65 in greater detail below in determining whether Illinois' peer-review privilege should be applied so as to protect these documents under the facts of this federal case.

    E. Documents 66 through 68

Document 66 is an undated, unsigned summary of the events that took place on the day

---

[2] "F-O-C-U-S P-D-C-A" is an acronym for the problem solving methodology employed by Defendants pursuant to its Evaluation of Variances and Level of Severity policy.

Ms. Belbachir died. Documents 67 and 68 constitute an undated, unsigned time line which outlines Ms. Balbachir's stay at the McHenry County Jail.

There is no suggestion that these documents were created during the Core Team's meeting of April 14, 2005, or during the Root Cause Analysis meeting of May 9, 2005. Therefore, as with documents 1 through 47, documents 66 through 68 fall outside the Act's protection because they are unrelated to the peer-review process.

V.   Whether the Balance of Interests Weighs in Favor of Applying the Peer-Review Privilege to Documents 48 through 65

Federal Rule of Civil Procedure 26(b)(1) provides that parties may discover any matter not privileged which is relevant to the subject matter involved in the pending action. In cases based upon a federal cause of action, the federal common law governs issues of privilege, even where the complaint states pendant state law claims. Fed.R.Evid. 501; *Memorial Hosp. for McHenry County v. Shadur*, 664 F.2d 1058, 1061 n. 3 (7th Cir. 1981). The principal claims underlying this case arise under the Civil Rights Act, 42 U.S.C. §1983, the Americans with Disabilities Act, 42 U.S.C. §12131, and § 504 of the Rehabilitation Act of 1973, 29 U.S.C. §794. Thus, the court is not obliged to apply Illinois' peer-review privilege. Instead, the question of whether the peer-review privilege should be recognized in this case is "governed by the principles of the common law as they may be interpreted by the courts of the United States in the light of reason and experience." Fed.R.Evid. 501.

In deciding whether to apply Illinois' peer-review privilege in federal court, the Seventh Circuit has relied on two fundamental principles. First, "because evidentiary privileges operate

9

to exclude relevant evidence and thereby block the judicial fact-finding function, they are not favored and, where recognized, must be narrowly construed." *Memorial Hosp. for McHenry County*, 664 F.2d at 1061 (*citing United States v. Nixon*, 418 U.S. 683, 710 (1974)). Second, a reviewing court should "take into account the particular factual circumstances of the case in which the issue arises" by weighing "the need for truth against the importance of the relationship or policy sought to be furthered by the privilege, and the likelihood that recognition of the privilege will in fact protect that relationship in the factual setting of the case." *Memorial Hosp. for McHenry County*, 664 F.2d at 1061-62 (*citing Ryan v. Commissioner of Internal Revenue*, 568 F.2d 531, 543 (7th Cir. 1977)).

On the "need for truth" side of the scale is the fact that the information concerning Defendant's policies and practices is critical to Plaintiff's *Monel* claim. In order for Plaintiff to meet his burden under *Monel*, Plaintiff will have to show either: 1) that the Defendant had an express policy, that when enforced, caused the constitutional deprivation; 2) that the Defendant had a widespread practice that, although not authorized by written law or express municipal policy, is so permanent and well settled as to constitute custom or usage within the force of law; or, 3) that the Plaintiff's constitutional injury was caused by a person with final policymaking authority." *McCormick v. City of Chicago*, 230 F.3d 319, 324 (7th Cir. 2000). While Defendants' express written policies may be easily discovered through the usual discovery channels, the unofficial, defacto practices and customs within the jail are much more difficult to expose.

In *Jenkins v. DeKalb Co., Georgia,* the court acknowledged the difficulty of discovering evidence of a jail's practices and customs in a civil rights case rooted in the death of an inmate.

No. 06 C 1574, 2007 WL 781870 (N.D. Ga. 2007). The court noted that the inherent difficulty in discovering evidence of jailhouse customs and policies explains why "nearly every United States district court that has addressed the issue in the context of section 1983 litigation brought on behalf of jail or prison inmates has rejected the assertion of [the peer-review] privilege." *Id*. at 7. (collecting cases on this point). The *Jenkins* court went on to point out that:

> There are unique considerations at play in a post-death investigation ordered by a county jail that dramatically weaken the case for recognizing the privilege. A review of a deceased inmate is not the straightforward evaluation of medical care that occurs in the civilian context. The generation of post-death reports . . . may include details such as when jail officials notified medical officials of a particular problem, and whether there was a reason for non-medical officials to have monitored the situation more closely. The report may verify the fact that a jail official failed to notify medical personnel. Not only is this type of information "nonmedical," but it [] also may shed light, or at least raise an inference, of jail customs or policies.

*Id.* at 8.

Through enacting section 1983, Congress used the power of the Fourteenth Amendment to set aside concerns over state sovereignty and authorize the federal courts to vindicate deprivations of liberty carried out under color of state law. 42 U.S.C. § 1983 ("Every person who, under color of any . . . custom . . . of any state . . . causes to be subjected , any citizen . . . to the deprivation of any rights . . . shall be liable to the party injured. . . ."). The interest in protecting the civil rights of individuals has led the courts to take caution before recognizing privileges in federal civil rights actions, "where any assertion of privilege must overcome the fundamental importance of a law meant to protect citizens from unconstitutional state action.'" *Kodish v. Oak Brook Terrace,* 235 F.R.D. 447, 451 (N.D. Ill. 2006), *quoting Hinsdale v. City of Liberal, Kansas,* 961 F.Supp. 1490, 1495 (D. Kan. 1997).

On the other side of the balance is the important policy underlying the peer-review

11

privilege. *See Memorial Hosp. for McHenry County*, 664 F.2d at 1062 (pointing out that the effectiveness of peer-review committees depends upon the confidentiality of their deliberations). By enacting the peer-review privilege, the Illinois legislature sought to encourage individuals with relevant information to speak freely without fear that "one doctor's suggestion will be used as a denunciation of a colleague's conduct in a malpractice suit." *Id.* (citing *Bredice v. Doctor's Hospital*, 50 F.R.D. 249, 250 (D.D.C. 1970)). It is generally accepted that the confidentiality of peer review material fosters the free flow of information between healthcare professionals, resulting in higher quality care at little cost to the victims of medical malpractice.[3]

> To recognize hospital review or disciplinary proceedings as privileged in the context of a malpractice action will generally have little impact upon the Plaintiff's ability to prove a meritorious claim. For the crucial issue in that type of case is not what occurred at the review proceeding, but whether the defendant was in fact negligent in his care and treatment of the Plaintiff. . . . [W]hat someone . . . at a subsequent date thought of these acts or omissions is not relevant to the case. More importantly, the exclusion of that information will not prevent the Plaintiff from otherwise establishing a valid claim.

*Memorial Hosp. for McHenry County*, 664 F.2d at 1062 (internal citations omitted).

However, the application of the peer-review privilege outside of the context of a medical malpractice case comes at a greater cost. In a civil rights case such as this one, evidence of unconstitutional policies and customs may not exist outside of the confines of a post-death consultation of jail personnel. Assuming there is some amount of a chill placed on the peer review process by allowing the discovery of peer-review material in the context of a federal civil rights action rooted in the death of an inmate, the court is nevertheless convinced that the need

---

[3] For a contrarian view on the effectiveness of the peer-review process, see Susan O. Scheutzow, *State Medcial Peer Review: High Cost But No Benefit– Is It Time for a Change?*, 25 Am. J.L. & Med. 7, 8 (1999) ("[A]nalysis of data available from the National Practitioner Data Bank (NPDB) suggests that peer review protection statutes do not encourage peer review.").

for truth in rooting out unconstitutional state-action outweighs that concern.

VI. Conclusion

Plaintiff's Motion to Compel is granted. Documents responsive to Plaintiff's Requests to Produce numbered 1, 2 and 5 are to be provided to the Plaintiff.

ENTER:

_____
P. MICHAEL MAHONEY, MAGISTRATE JUDGE
UNITED STATES DISTRICT COURT

DATE: July 25, 2007