# United States District Court, Northern District of Illinois

| Name of Assigned Judge or Magistrate Judge | Philip G. Reinhard | Sitting Judge if Other than Assigned Judge | |
|---|---|---|---|
| **CASE NUMBER** | 06 C 1392 | **DATE** | 9/28/2012 |
| **CASE TITLE** | Belbachir vs. County of McHenry, et al. | | |

**DOCKET ENTRY TEXT:**

For the reasons stated below, the Centegra Defendants motion for summary judgment is granted in part and denied in part. Summary judgment is granted in favor of the Centegra Defendants on all claims except the wrongful death claim of Count VIII and the respondeat superior claim of Count XI. Plaintiff's motion to strike and to file surreply [493] is denied as moot. This case is set for status before this court on October 15, 2012 at 11:00 a.m.

*Philip G. Reinhard*

Electronic Notices.

■[ For further details see text below.]

## STATEMENT - OPINION

Plaintiff, Abdelkadir Rachid Belbachir, as administrator of the estate of Hassiba Belbachir, brings this action against, inter alia, Centegra Health Systems ("Centegra"), Marcia Middleton Kaplan ("Nurse Kaplan"), Vicki Frederick ("Therapist Frederick"), Dr. Chandragupta Vedak ("Dr.Vedak") and Barbara Svitak ("Nurse Svitak") (collectively the "Centegra Defendants"). Hassiba Belbachir committed suicide while detained in the McHenry County Jail as an immigration detainee held by U.S. Immigration & Customs Enforcement ("ICE") and housed by McHenry County.[1] Centegra provided health care services at the jail under a contract with McHenry County. The Centegra Defendants move for summary judgment.[2]

For purposes of summary judgment, the facts are taken most favorably to the plaintiff with all reasonable inferences drawn in plaintiff's favor. Hassiba Belbachir, a foreign national of Algerian descent, was admitted to the United States for a visit in November 2004. She came to Chicago. She left the United States on February 27, 2005 and was detained in England by immigration authorities. On March 8, 2005, she was returned by British authorities to Chicago O'Hare International Airport her point of origin. She was interviewed by a Custom and Border Protection ("CBP") Officer. The Officer noted she cried during the interview and reported she had kidney problems and had been hospitalized the previous month. On March 8, 2005, she was determined to be removable and was taken into immigration custody in order to process an asylum application.

At approximately 2:48 a.m., March 9, 2005, she was taken by ambulance to Gottlieb Memorial Hospital and diagnosed with an acute anxiety reaction, acute gastritis and was given anti-anxiety medication and medication for nausea and gastritis. She was released from the hospital around 6:00 a.m. At approximately 7:00 a.m., she was taken by an ICE Agent to the Broadview Service Staging Area. Later in the day she was picked up by McHenry County Sheriff transport officers. Correctional Officer Drach did an intake screening at the McHenry County Jail for Hassiba. The form he filled out shows Hassiba answered "yes" to the question "Have you ever attempted suicide?" The form indicates the attempt was in 2000. In answer to the question "Why?" the answer given was "Depression." The question "Are you currently extremely depressed or feeling suicidal?" has "yes' scribbled out and "no" circled. Drach testified in his deposition that he erroneously circled "yes" to this question when he meant to circle "yes" in answer to the prior question. He says he crossed out the "yes" and circled "no" to correct his mistake while Hassiba was still sitting with him.[3] She also reported having kidney problems.

After Hassiba's intake was completed, Nurse Svitak administered a tuberculosis test and documented that it was complete. She was informed Hassiba was suicidal on a previous occasion and saw that the answer to whether she was currently extremely depressed or suicidal had "yes" scratched over and "no" circled.

Nurse Kaplan was called by jail staff for an emergency medical assessment on March 12, 2005 at approximately 3:40 p.m. On arriving at her cell at 3:48 p.m., Nurse Kaplan found Hassiba breathing rapidly and moaning. She was non-responsive to verbal or nail pain stimuli. Her extremities and neck were stiff. At 3:57 p.m., her upper extremities were relaxed but her lower extremities remained flexed and stiff. Correctional Officer Shields told Kaplan the symptoms started after the jail's 3:30 p.m. lockdown. Through a language line interpreter, speaking French, Hassiba said she had a panic attack and was stressing out alone in her room,

that she can't communicate with anyone, and her family does not know what's going on. Her mother died four years previously and she had a panic attack at that time too. Nurse Kaplan contacted Dr. Vedak who prescribed Klonipin, an anti-anxiety medication, for Hassiba.

On March 13, 2005, Hassiba suffered another panic attack causing breathing problems, rapid heart rate, leg stiffness and cramps. Nurse Kaplan reported Hassiba had a deep concern about spending the rest of her life on medication, felt ostracized by other prisoners since her panic attack. Hassiba was assigned at this time to the medical pod in the jail where she was assigned one of the two cells on the female side of the pod. Nurse Kaplan arranged for Hassiba to meet with Therapist Frederick.

On March 14, 2005, Therapist Frederick met with Hassiba. She conducted half of the interview in Spanish and the second half, through use of the language line, in French. In her deposition, she testified she spent about an hour with Hassiba. She testified Hassiba had told her that she thought about suicide sometimes or sometimes felt suicidal but that Hassiba said "no" when asked if she was going to do something to harm herself. She testified she explained to Hassiba that she believed Hassiba had clinical depression and that she would need to take medication to get better and that she would have to see a doctor to get a prescription for the medication. Hassiba had agreed to see Dr. Vedak for this. Therapist Frederick testified Hassiba seemed to be reacting normally in their conversations for the most part, that she made good eye contact, and seemed to have some rapport with her. She testified Hassiba seemed better after she explained about Dr. Vedak and the medication. She testified Hassiba cared about what her sister thought about her and did not want to hurt her sister and that not wanting to hurt a family member is usually something that reduces the risk of suicide.

In her mental health progress notes, Therapist Frederick reported that Hassiba was very depressed and suicidal but that she did not have a specific plan for killing herself. She noted Hassiba experienced feelings of agitation, anger, anxiety, depression, hopelessness and helplessness. Cognitively she experienced a loss of pleasure, guilt and hallucinations. Hassiba believed she was dying and said "death is dripping slowly, drop by drop." She reported hearing hallucinatory sounds ("like parasites or radio waves.") She said "I'd rather die than live like this." She reported, in the mental health progress notes, that Hassiba was willing to see the doctor and take medication if it is prescribed. Therapist Frederick planned to have Hassiba meet with the psychiatrist, Dr. Vedak, on his next schedule visit to the jail on March 18, 2005.

Neither the mental health progress notes nor the nurse progress notes show any contact with Hassiba by the medical staff after Therapist Frederick's meeting until March 17, 2005 at 4:20 p.m. The record does not show any reports by the jail staff to any of the Centegra Defendants of any problems with Hassiba between Therapist Frederick's meeting with her and 4:20 p.m. on March 17. During this time period Hassiba received her medication three times per day and spoke with her sister on the telephone twice.

On March 17 at 4:20 p.m., Nurse Svitak responded to a Code 3 from the medical pod, went to Hassiba's cell, and found her lying on the floor with her jail-issued knee socks wrapped around her neck and her face deep purple in color. She had no pulse and was not breathing. No CPR was attempted. A defibrillator was attached but not able to shock her. She had no shockable pulse. She was transported by ambulance to the hospital and pronounced dead at 5:05 p.m.

An immigration detainee is treated as the equivalent of a pretrial detainee so that the detainee's constitutional claims are considered under the due process clause instead of the Eight Amendment. Edwards v. Johnson, 209 F.3d 772, 778 (5th Cir. 2000). However, the same standard applies for pretrial detainees and incarcerated individuals when it comes to medical care. Estate of Miller v. Tobiasz, 680 F.3d 984, 989 (7th Cir. 2012).[4] The deprivation must be objectively, sufficiently serious and the mental state of the prison official must have been one of deliberate indifference to inmate health or safety. Id. Suicide satisfies the first prong because it is a serious harm. Id. Under the second prong, deliberate indifference, an official cannot be found liable "for denying an inmate humane conditions of confinement unless the official knows of and disregards an excessive risk to inmate health or safety; the official must be both aware of facts from which the inference could be drawn that a substantial risk of serious harm exists, and he must also draw that inference." Id.

In a suicide case, to establish the deliberate indifference prong, plaintiff must show defendant 1) subjectively knew the prisoner was at substantial risk of committing suicide and 2) intentionally disregarded that risk. Minix v. Canarecci, 597 F.3d 824, 831 (7th Cir. 2010). It is enough if an official acted or failed to act despite his knowledge of a substantial risk of serious harm. Cavilieri v. Shepard, 321 F.3d 616, 622 (7th Cir. 2003).

Defendants knew Hassiba had reported herself to be suicidal and extremely depressed on intake to the jail. They knew she had suffered panic attacks on March 12 and March 13. After the occurrence of the first panic attack, Nurse Kaplan contacted Dr. Vedak and obtained anti-anxiety medication for Hassiba. She arranged a roommate for Hassiba. After the second panic attack, Nurse Kaplan had her moved to the medical pod. Nurse Kaplan arranged for Therapist Frederick to meet with Hassiba on March 14.

Therapist Frederick met with her on that date and reported Hassiba was very depressed and suicidal, that she was hearing hallucinatory sounds, and that she said she would rather die than "live like this" but denied having a specific plan. Hassiba said she would not harm herself and agreed to meet with Dr. Vedak and to take any medication he prescribed. Therapist Frederick scheduled Hassiba to see Dr. Vedak on March 18, his next scheduled visit to the jail. She killed herself before that visit.

These actions do not support a claim that Nurse Kaplan, Therapist Frederick, Nurse Svitak or Dr. Vedak subjectively knew Hassiba was at substantial risk of committing suicide. The evidence shows Nurse Kaplan interviewed Hassiba, assessed her medical needs, and took action to treat the conditions she observed. She obtained a prescription for anti-anxiety medication for the

panic attacks and arranged a meeting with a mental health professional, Therapist Frederick.

Therapist Frederick interviewed Hassiba, assessed her medical needs, and took action to treat the conditions she observed. Frederick scheduled a visit for Hassiba with Dr. Vedak to deal with her mental health issues specifically her depression. She determined that she was not an immediate suicide risk.

Dr. Vedak took the information he was given by Kaplan concerning the panic attacks and prescribed medication to treat it. He was scheduled to meet with Hassiba about her depression.

Nurse Svitak knew from reading the intake form that Hassiba had been suicidal on a previous occasion. However, Nurse Kaplan and Therapist Frederick each interviewed Hassiba subsequently and Therapist Frederick determined she was not an imminent suicide risk. Any action or inaction by Nurse Svitak is not relevant in light of the subsequent evaluations. Further, no evidence establishes Nurse Svitak subjectively knew Hassiba had a substantial risk of suicide.

This case is distinguishable from Cavilieri, where the inmate had just been arrested for kidnaping his ex-girlfriend and threatening to kill both himself and her with a gun he had in his possession. Cavilieri, 321 F.3d at 62. Both the ex-girlfriend and the inmate's mother told the defendant therein, an officer at the city jail, that the inmate was at risk for suicide and the ex-girlfriend had told the defendant that the inmate told her he would kill himself if he was ever returned to jail. Id. at 622. The defendant knew the inmate had been on suicide watch when he was in jail the month before. Id. This kind of evidence is not in the record here. Nurse Kaplan and Therapist Frederick drew their conclusions and decided their courses of action based on the information they had available, primarily their own interactions with Hassiba. They made professional judgments based on what they knew. The record does not support a finding they subjectively knew Hassiba posed a substantial suicide risk.

Plaintiff contends Nurse Svitak was deliberately indifferent when she failed to perform CPR when she responded to the Code 3 call. However, the evidence shows Hassiba's face was deep purple in color and that she was not breathing and had no pulse. Nurse Svitak used a defibrillator which failed to restart a pulse. To be liable for deliberate indifference Nurse Svitak must have known of and disregarded an excessive risk to Hassiba's health or safety. Estate of Miller, 680 F.3d at 989. Nurse Svitak did not disregard the risk to Hassiba. She attempted to revive her by using the defibrillator.

Plaintiff argues Centegra is liable because its policies, procedures, and customs were unconstitutional leading to Hassiba's death. However, since no Centegra employee has been found liable, Centegra cannot be either under these circumstances. Plaintiff cites Thomas v. Cook County Sheriff's Dep't, 604 F.3d 193, 305 (7th Cir. 2009) to support the claim Centegra could be held liable even when its employees are not. However, Thomas upheld jury verdicts finding the county liable but not its employees where based on the instructions the jury could have found the employees were not deliberately indifferent "but simply could not respond adequately because of the well-documented breakdown of the County's policies for retrieving medical request forms." Id. Here, the evidence has not established a constitutional violation from the actions of the employees, so there is no basis for Centegra to be liable under Monell. See Matthews v. City of East St. Louis, 675 F.3d 703, 709 (7th Cir. 2012).

Plaintiff claims the Centegra Defendants failed to accommodate Hassiba's disability under the Americans with Disabilities Act and the Rehabilitation Act. To establish a claim under the ADA or Rehabilitation Act, plaintiff must show Hassiba 1) was a qualified individual with a disability; 2) that she was excluded from participating in, or denied the benefits of a public entity's services, programs or activities or was otherwise discriminated against; and 3) that such exclusion, denial of benefits, or discrimination was by reason of her disability. Kiman v. New Hampshire Dep't of Corrections, 451 F.3d 274, 283 (1st Cir. 2006). Major depression can be a disability for purposes of the ADA and Rehabilitation Act. Cassimy v. Bd. of Educ. of the Rockford Public Schools, 461 F.3d 932, 936 (7th Cir. 2006). Plaintiff's claim is off the mark. Plaintiff is not complaining Hassiba was discriminated against because of her depression. He is claiming she was not properly treated for it. Plaintiff's showing of unreasonable medical treatment must be framed within some larger theory of disability discrimination to be actionable under the ADA or Rehabilitation Act. Kiman, 451 F.3d at 284. No such larger theory is presented.

Plaintiff also asserts state law claims for wrongful death, intentional infliction of emotional distress, civil conspiracy and respondeat superior. Defendants argue the wrongful death claim is brought solely under a wilful and wanton theory and that wilful and wanton conduct has not been shown. However, Count VIII of the complaint alleges the "wrongful death of Hassiba Belbachir was proximately caused by the neglect, default, and/or willful and wanton conduct" of defendants. This mirrors the language of the Illinois Wrongful Death Act which provides a cause of action when "the death of a person shall be caused by wrongful act, neglect or default." 740 ILCS 180/1. Negligence is clearly put in issue. In their reply, defendants argue a negligence claim cannot be supported because plaintiff has not identified a qualified standard of care expert as required by Illinois law. The court will not consider this argument as it is raised for the first time in defendants' reply brief and is, therefore, waived. McReynolds v. Merrill Lynch & Co., Inc., No. 11-1957, 2012 WL 3932328, *14, n.9 (7th Cir. Sept. 11, 2012). This claim survives summary judgment.[5]

Plaintiff claims intentional infliction of emotional distress. To prove intentional infliction of emotional distress plaintiff must show 1) the defendant engaged in "extreme and outrageous" conduct toward Hassiba; 2) the defendant intended or recklessly disregarded the probability that the conduct would cause her to suffer emotional distress; 3) Hassiba endured "severe or extreme" emotional distress; and 4) the defendants' conduct actually and proximately caused her distress. Ulm v. Memorial Medical Center, 964 N.E.2d 632, 641 (Ill. App. 2012). Plaintiff contends that the high degree of power defendants had over Hassiba, because she was incarcerated, makes the conduct of defendants toward Hassiba "extreme and outrageous." McGrath v. Fahey, 533 N.E.2d 806 (Ill. 1988). Plaintiff does not identify which specific conduct of any defendant was "extreme and outrageous." Looking at the

| STATEMENT - OPINION |
|---|

evidence of the conduct of the various defendants, as discussed above when considering the issue of deliberate indifference, does not show any conduct that objectively can be characterized as "extreme and outrageous."

Plaintiff asserts a claim for civil conspiracy. The elements of civil conspiracy plaintiff must prove are: 1) a combination of two or more persons; 2) for the purpose of accomplishing by some concerted action either an unlawful purpose or a lawful purpose by unlawful means; and 3) in furtherance of which one of the conspirators committed an overt tortious or unlawful act. Miller v. Hecox, 969 N.E.2d 914 (Ill. App. 2012). Here, there is no evidence of concerted action for an unlawful purpose or for a lawful purpose by an unlawful means. There is no direct or circumstantial evidence of any of the defendants acting with any of the others for the purpose of taking an unlawful act or to commit a tortious act.

Count XI seeks to hold Centegra liable on a theory of respondeat superior. Centegra argues its employees did not commit any torts in the scope of their employment so it cannot be liable under this theory. Because the wrongful death claim survives, Centegra may be liable on a respondeat superior theory.

For the foregoing reasons, the Centegra Defendants motion for summary judgment is granted in part and denied in part. Summary judgment is granted in favor of the Centegra Defendants on all claims except the wrongful death claim of Count VIII and the respondeat superior claim of Count XI. Plaintiff's motion to strike and to file surreply [493] is denied as moot. This case is set for status before this court on October 15, 2012 at 11:00 a.m.

---

1. Plaintiff also sues McHenry County, it's sheriff, and several members of the sheriff's corrections department staff. Those defendants separately moved for summary judgment.

2. Plaintiff moves to strike the Centegra Defendants' reply to plaintiff's response to the Centegra Defendants' statement of facts and to file a surreply [493]. The court did not consider the Centegra Defendants' reply to plaintiff's response in deciding the summary judgment motion and the court considered the arguments in plaintiff's motion to file surreply as the surreply. Plaintiff's motion is denied as moot.

3. For purposes of summary judgment, all reasonable inferences must be drawn in plaintiff's favor. Drach's version is certainly plausible but accepting it requires judging his credibility which cannot be done on summary judgment. Therefore, the court will assume for summary judgment purposes that Hassiba answered "yes" to the "Are you currently extremely depressed or feeling suicidal?" question.

4. Plaintiff argues that a Fourth Amendment reasonableness standard should be applied, as was done in Ortiz v. City of Chicago, 656 F.3d 523 (7th Cir. 2011) where the prisoner had not yet had a judicial determination of probable cause. Plaintiff does not cite any cases where this standard has been applied to immigration detainees and the court finds the due process standard, as applied in Edwards, to be the proper standard.

5. The adequacy of pleading a negligence claim should have been addressed long before the summary judgment motion.