# United States District Court, Northern District of Illinois

| Name of Assigned Judge or Magistrate Judge | Philip G. Reinhard | Sitting Judge if Other than Assigned Judge | |
|---|---|---|---|
| **CASE NUMBER** | 06 C 1392 | **DATE** | 9/28/2012 |
| **CASE TITLE** | Belbachir vs. County of McHenry, et al. | | |

**DOCKET ENTRY TEXT:**

For the reasons stated below, the McHenry Defendants' motion for summary judgment is granted. Summary judgment is granted in favor of the McHenry Defendants and against plaintiff on all claims. Plaintiff's motion to file surreply is denied as moot. This case is set for status before this court on October 15, 2012 at 11:00 a.m.

*Philip G. Reinhard*

Electronic Notices.

■[ For further details see text below.]

---

## STATEMENT - OPINION

Plaintiff, Abdelkadir Rachid Belbachir, as administrator of the estate of Hassiba Belbachir, brings this action against McHenry County[1], Sheriff Keith Nygren, Chief of Corrections Tom Svoboda, Correctional Officer ("CO") Brad Drach, CO Kevin Ford, CO Keith Gorak, CO Gerald Broderick and CO Daniel Sitkie (collectively "McHenry Defendants".) Hassiba Belbachir committed suicide while detained in the McHenry County Jail as an immigration detainee held by U.S. Immigration & Customs Enforcement ("ICE") and housed by McHenry County.[2] The McHenry Defendants move for summary judgment.[3]

Centegra provided medical services at the McHenry County Jail during Hassiba's detention there. There is a presumption that non-medical officials are entitled to defer to the professional judgment of the facility's medical officials on questions of an inmate's medical care and cannot be found deliberately indifferent unless they have reason to believe the medical officials are mistreating an inmate. Hayes v. Snyder, 546 F.3d 516, 527 (7th Cir. 2008). As discussed in the Centegra Order, the evidence did not support a claim that the Centegra Defendants were deliberately indifferent to Hassiba's medical needs. It follows that the McHenry Defendants cannot be liable for a constitutional violation for any actions they took or failed to take based on their reliance on the Centegra Defendants performance of medical services related to Hassiba which would include suicide risk assessment and treatment for her panic attacks and depression. Any liability for the McHenry Defendants would have to be based on actions taken or not taken independently from those medical services.

CO Drach did an intake screening at the McHenry County Jail for Hassiba. The form he filled out shows Hassiba answered "yes" to the question "Have you ever attempted suicide?" The form indicates the attempt was in 2000. In answer to the question "Why?" the answer given was "Depression." The question "Are you currently extremely depressed or feeling suicidal?" has "yes" scribbled out and "no" circled. Drach testified in his deposition that he erroneously circled "yes" to this question when he meant to circle "yes" in answer to the prior question. He says he crossed out the "yes" and circled "no" to correct his mistake while Hassiba was still sitting with him.[4] She also reported having kidney problems.

On March 16, 2005, Hassiba received her medication from a Centegra nurse at scheduled medication passes at 9:00 a.m., 2:00 p.m. and 9:00 p.m. She spoke with her sister on the telephone that evening asking her sister for the phone number of an internet café in Chicago where they had met a lawyer. Hassiba wanted to contact him for assistance in making her immigration go faster. Hassiba told her sister she would call her again the next morning.

CO Broderick was working in the jail medical pod on March 16, 2005 between 2:00 and 4:00 p.m. When he passed by Hassiba's cell, during his every half hour check, he saw that she was lying on the floor but could not see her head. He did not think this was an unusual position but was concerned because he could not see her head so he opened

the door. She was lying on her stomach and she looked up at him and smiled. He asked her why she was on the floor, she spoke in a foreign language (he did not know which language) and she "pointed to the floor smiling, like this is where I want to be." He did not know how long she had been lying on the floor but believes she was on the floor during his entire two hour shift.

On March 17, 2005, Hassiba received her medication from a Centegra nurse at scheduled medication passes at 9:00 a.m. and 2:00 p.m. That morning, Hassiba called her sister again and asked if she had obtained the number of the café in Chicago. Her sister had obtained the number and gave it to Hassiba. Hassiba said she would call her sister again that night.

On March 17, 2005, CO Broderick again worked the 2:00 to 4:00 p.m. two hour med pod shift. He saw Hassiba lying on her stomach on the cell floor. Again, he could not see her head. He did not open the door, knock on the door, or speak to her. He did not know whether she was alive or not during his two hour shift.

On March 17, 2005, CO Ford came on duty at the med pod around 3:38 p.m, to relieve CO Broderick. He did his first head count at approximately 3:40p.m. Through the window in Hassiba's cell he could see her lying on her stomach on the floor. He could only see from the small of her back to her feet. He could not see her face. He hit the glass with his hand and said "Hey," but she did not respond. He did not know if she was dead or alive at this time. He went back to the control room and asked CO Broderick and CO Gorak (who was there because he had covered for CO Broderick when he had taken a smoke break around 3:00 p.m.) whether she normally slept like that and they told him that she had been like that all day that she sleeps like that all the time. Unsure whether he had seen her move, he returned to her cell and tapped on the window. Again, there was no response. He did not enter her cell, or take any other action to check on her well being or ask for medical staff to come and check on her.

At 4:10 p.m., CO Ford announced over the intercom that the inmates should get up and get ready to eat. He did not receive a response from Hassiba. When he got to her cell with the meal, he could see she was lying in the same position he had seen her in a half hour before. She was lying on her face with her nose and mouth on the ground. He saw a small area of blood in front of her. He called a Code 3 medical emergency. He shook Hassiba's arm but got no response.

Nurse Svitak, CO Sitkie, and CO Veneziano arrived shortly after the Code 3 call. CO Veneziano rolled Hassiba onto her back and removed the Jail issued knee socks that were wrapped around her neck. Her lips were deeply discolored – blue/black– and her face was deep purple in color. Until CO Veneziano removed the socks, CO Ford had not seen them around her neck. CO Sitkie went to get a defibrillator ("AED"). When someone asked whether they should be performing CPR, Nurse Svitak said Hassiba was dead, that it would not help, but that they would try. She applied a facemask for CPR but was unable to use it. She obtained a second facemask but did not use it due to her judgment Hassiba was dead. CO Ford applied the AED to Hassiba. As he put the AED pad on her, his hand touched the bare skin on her side or abdomen and it was ice cold. After bringing the AED, CO Sitkie went to the garage to wait for the ambulance. When it arrived he escorted the paramedics to med pod.

Plaintiff contends that correctional officers Drach, Broderick, Gorak, Ford and Sitkie as well as Chief of Corrections Svoboda, and Sheriff Nygren are liable under section 1983. An immigration detainee is treated as the equivalent of a pretrial detainee so that the detainee's constitutional claims are considered under the due process clause instead of the Eight Amendment. Edwards v. Johnson, 209 F.3d 772, 778 (5th Cir. 2000). However, the same standard applies for pretrial detainees and incarcerated individuals when it comes to medical care. Estate of Miller v. Tobiasz, 680 F.3d 984, 989 (7th Cir. 2012).[5] The deprivation must be objectively, sufficiently serious and the mental state of the prison official must have been one of deliberate indifference to inmate health or safety. Id. Suicide satisfies the first prong because it is a serious harm. Id. Under the second prong, deliberate indifference, an official cannot be found liable "for denying an inmate humane conditions of confinement unless the official knows of and disregards an excessive risk to inmate health or safety; the official must be both aware of facts from which the inference could be drawn that a substantial risk of serious harm exists, and he must also draw that inference." Id.

In a suicide case, to establish the deliberate indifference prong, plaintiff must show defendant 1) subjectively knew the prisoner was at substantial risk of committing suicide and 2) intentionally disregarded that risk. Minix v. Canarecci, 597 F.3d 824, 831 (7th Cir. 2010). It is enough if an official acted or failed to act despite his knowledge of a substantial risk of serious harm. Cavilieri v. Shepard, 321 F.3d 616, 622 (7th Cir. 2003).

CO Drach's only contact with Hassiba was the intake interview. Taking the facts most favorably to plaintiff,

Hassiba answered "yes" to the question: "Are you currently extremely depressed or feeling suicidal?" when being interviewed by CO Drach. Plaintiff contends he should have placed her on suicide watch. However, as discussed in the Centegra Order, Hassiba was interviewed several times after the intake interview by members of the medical staff who obtained information concerning her mental state firsthand. They based their medical judgments on these firsthand interactions. CO Drach's conduct of the intake interview and his failure to place her on suicide watch, in light of her subsequent interactions with the medical staff, cannot be considered deliberately indifferent. The evidence is insufficient to show CO Drach subjectively believed Hassiba was at substantial risk of committing suicide, see Minix, 597 F.3d at 831, and he had no reason to believe the medical staff was mistreating Hassiba. See Hayes, 546 F.3d at 527.

Plaintiff argues CO Sitkie is liable because he failed to place Hassiba on suicide watch even though he saw her crying and learned she was sad about being locked-up, uncertain about being deported and afraid. CO Sitkie knew Hassiba was having panic attacks. This evidence is insufficient to establish CO Sitkie subjectively believed Hassiba was at substantial risk of committing suicide. See Minix, 597 F.3d at 831. CO Sitkie had no reason to believe the medical staff was not adequately handling Hassiba's care so he cannot be found to have been deliberately indifferent. See Hayes v. Snyder, 546 F.3d at 527.

The only evidence as to CO Gorak is that he relieved CO Broderick for about seven minutes around 3:00 p.m. on March 17, 2005, so CO Broderick could take a smoke break. There is no indication he saw Hassiba during this time. He was still in the med pod control room when CO Ford came on duty around 3:38 p.m. and when CO Ford came back to the control room to inquire about Hassiba being on the floor. This evidence is insufficient to establish CO Gorak was deliberately indifferent.

Plaintiff argues CO Broderick was deliberately indifferent because he did nothing when he found Hassiba lying on the floor on March 16, 2005. However, lying on the floor is not in itself indicative of a substantial risk of suicide. Plaintiff does not dispute CO Broderick opened the door and spoke with her at that time. He concluded from this interaction that she was happy lying on the floor. While plaintiff questions the credibility of CO Broderick's deposition testimony on this point, plaintiff's only evidence of what occurred at that time is also Broderick's testimony that he found her on the floor that day. Plaintiff must present evidence that lying on the floor is indicative of an imminent threat of suicide. No such evidence exists.

CO Broderick also found Hassiba lying on the floor the next day during the 2:00 p.m. to 4:00 p.m. shift. This time, according to CO Broderick, she was on the floor during his entire two hour shift and he made no effort to speak with her, open the door, or check on her. The evidence shows Hassiba received her medication at the 2:00 p.m. med pass. CO Broderick did not believe her lying on the floor was a concern in light of his encounter with her the previous day. The evidence does not show CO Broderick subjectively knew Hassiba at substantial risk of committing suicide. See Minix, 597 F.3d at 831. "It is not enough that there was a danger of which the prison official should have been aware, rather the official must be both aware of facts from which the inference could be drawn that a risk of substantial harm exists, and he must also draw the inference." Collins v. Seeman, 462 F.3d 757, 761 (7th Cir. 2006) (internal quotation marks omitted). The evidence does not show CO Broderick was aware of facts, or drew the inference from any facts, that a substantial risk of harm existed for Hassiba.

CO Ford found Hassiba lying on the floor and got no response from her when he banged on the door. Rather than open the door to check on her, he returned to the control room to ask CO Broderick and CO Gorak whether she always slept that way. He was told "yes" and that she had been that way all day. These facts do not show that CO Ford was aware of facts indicating Hassiba was an imminent suicide risk.

At 4:10 p.m. on March 17, 2005, when CO Ford brought Hassiba her meal, he saw she was in the same position as she had been half an hour earlier. He noticed blood by her mouth. He called a Code 3 medical emergency. After Nurse Svitak arrived, she advised CO Ford and the others that Hassiba was dead. Even so, the AED was brought and CO Ford applied it to Hassiba. Co Ford was entitled to defer to the judgment of the medical professional, Nurse Svitak, and cannot be found deliberately indifferent for his actions. See Hayes v. Snyder, 546 F.3d 516, 527 (7th Cir. 2008). Plaintiff has presented no evidence to rebut Nurse Svitak's determination that Hassiba was dead and that attempts at resuscitation would be unavailing.

Plaintiff argues Sheriff Nygren and Chief of Corrections Svoboda are liable because their policies, procedures, and customs were unconstitutional leading to Hassiba's death. However, since no jail employee has been found liable for a constitutional violation, Nygren and Svoboda cannot be either under these circumstances. Plaintiff cites Thomas

v. Cook County Sheriff's Dep't, 604 F.3d 193, 305 (7th Cir. 2009) to support the claim they could be held liable even when their employees are not. However, Thomas upheld jury verdicts finding the county liable but its employees not where based on the instructions the jury could have found the employees were not deliberately indifferent "but simply could not respond adequately because of the well-documented breakdown of the County's policies for retrieving medical request forms." Id. Here, the evidence has not established a constitutional violation from the actions of the employees, so there is no basis for Nygren or Svoboda to be liable under Monell. See Matthews v. City of East St. Louis, 675 F.3d 703, 709 (7th Cir. 2012).

Plaintiff claims the McHenry Defendants are liable for failure to comply with the requirements of Article 36 of the Vienna Convention on Consular Relations and Article 33 of the Consular Convention between the United States of America and the Democratic and Popular Republic of Algeria. Both articles deal with the right of a detained individual to notification of his home country's consulate that he is being detained. The right to consular notification is an individual right and a claim for its deprivation may be pursued under section 1983. Jogi v. Voges, 480 F.3d 822, 835-36 (7th Cir. 2007). This court previously found on the McHenry Defendants' motion to dismiss [52] that local authorities such as Sheriff Nygren had a duty of consular notification irrespective of any duty of federal immigration authorities. This was a close question on which there was no direct precedent. While the evidence presented on summary judgment, indicates it was the policy of the Department of Homeland Security for its personnel to undertake the obligation of consular notification, there is no evidence they actually did so in Hassiba's case. The McHenry Defendants' assert in paragraph 21 of their statement of facts that a Custom and Border Patrol agent advised her of her right to communicate with the Algerian Consulate but the citation to the agent's deposition does not support this assertion. Since the McHenry Defendants admit they did not comply with the notification requirement, they are not entitled to summary judgment on this basis.

The McHenry Defendants argue they are entitled to qualified immunity on the consular notification issue because they could not have reasonably known they were obligated to meet the requirements of the Algerian Convention with respect to a person who was arrested and detained by federal immigration authorities. "Qualified immunity shields government officials from liability under Section 1983 for actions taken while performing discretionary functions, unless the conduct violates clearly established statutory or constitutional rights of which a reasonable person would have known." Gruenberg v. Gempeler, No. 10-3391, 2012 WL 4372512, *3 (7th Cir. Sept. 26, 2012) (internal quotation marks and citation omitted). If reasonably competent officers could disagree, then qualified immunity applies. Id. Under the circumstances here, where the federal authorities were detaining Hassiba and had admittedly taken on the responsibility of consular notification, it would have been reasonable for the McHenry Defendants to conclude that the consular notification responsibility belonged exclusively to the federal authorities and that those authorities had carried it out. Moreover, in 2006, there was no clearly established precedent that a county authority holding a federal immigration detainee had a separate obligation under the Algerian Convention to provide the required consular notification. The McHenry Defendants are entitled to qualified immunity for the consular notification claim.

Plaintiff claims the McHenry Defendants failed to accommodate Hassiba's disability under the Americans with Disabilities Act and the Rehabilitation Act. To establish a claim under the ADA or Rehabilitation Act, plaintiff must show Hassiba 1) was a qualified individual with a disability; 2) that she was excluded from participating in, or denied the benefits of a public entity's services, programs or activities or was otherwise discriminated against; and 3) that such exclusion, denial of benefits, or discrimination was by reason of her disability. Kiman v. New Hampshire Dep't of Corrections, 451 F.3d 274, 283 (1st Cir. 2006). Major depression can be a disability for purposes of the ADA and Rehabilitation Act. Cassimy v. Bd. of Educ. of the Rockford Public Schools, 461 F.3d 932, 936 (7th Cir. 2006). Plaintiff's claim is off the mark. Plaintiff is not complaining Hassiba was discriminated against because of her depression. He is claiming she was not properly treated for it. Plaintiff's showing of unreasonable medical treatment must be framed within some larger theory of disability discrimination to be actionable under the ADA or Rehabilitation Act. Kiman, 451 F.3d at 284. No such larger theory is presented.

Plaintiff claims intentional infliction of emotional distress. To prove intentional infliction of emotional distress plaintiff must show 1) the defendant engaged in "extreme and outrageous" conduct toward Hassiba; 2) the defendant intended or recklessly disregarded the probability that the conduct would cause her to suffer emotional distress; 3) Hassiba endured "severe or extreme" emotional distress; and 4) the defendants' conduct actually and proximately caused her distress. Ulm v. Memorial Medical Center, 964 N.E.2d 632, 641 (Ill. App. 2012). Plaintiff

contends that the high degree of power defendants had over Hassiba, because she was incarcerated, makes the conduct of defendants toward Hassiba "extreme and outrageous." McGrath v. Fahey, 533 N.E.2d 806 (Ill. 1988). Plaintiff does not identify which specific conduct of any defendant was "extreme and outrageous." Looking at the evidence of the conduct of the various defendants, as discussed above when considering the issue of deliberate indifference, does not show any conduct that objectively can be characterized as "extreme and outrageous."

Plaintiff asserts a claim for civil conspiracy. The elements of civil conspiracy plaintiff must prove are: 1) a combination of two or more persons; 2) for the purpose of accomplishing by some concerted action either an unlawful purpose or a lawful purpose by unlawful means; and 3) in furtherance of which one of the conspirators committed an overt tortious or unlawful act. Miller v. Hecox, 969 N.E.2d 914 (Ill. App. 2012). Here, there is no evidence of concerted action for an unlawful purpose or for a lawful purpose by an unlawful means. There is no direct or circumstantial evidence of any of the defendants acting with any of the others for the purpose of taking an unlawful act or to commit a tortious act.

Plaintiff claims the McHenry Defendants are liable under state law for wrongful death, and that Sheriff Nygren is liable for the actions of his employees under a theory of respondeat superior and pursuant to 745 ILCS 10/9-102 which makes a local public entity liable to pay any tort judgment for which its employee while acting within the scope of his employment is liable. The McHenry Defendants argue the provisions of the Illinois Local Governmental and Governmental Employees Tort Immunity Act, 745 ILCS 10/1-101et seq., grant them immunity from these claims.

"Neither a local public entity nor a public employee is liable for injury proximately caused by the failure of the employee to furnish or obtain medical care for a prisoner in his custody." 745 ILCS 10/4-105. However, this immunity does not apply "where the employee, acting within the scope of his employment, knows from his observation of conditions that the prisoner is in need of immediate medical and, through willful and wanton conduct, fails to take reasonable action to summon medical care. Nothing in this Section requires the periodic inspection of prisoners." Id. The willful and wanton standard is "remarkably similar" to the deliberate indifference standard applied above. Williams v. Rodriguez, 509 F.3d 392, 404-05 (7th Cir. 2007). As discussed above, plaintiff has not established any of the McHenry Defendants were deliberately indifferent to Hassiba's medical needs. None of the individual defendants were shown to have been subjectively aware she was at substantial risk of suicide. Accordingly, they are entitled to summary judgment on these state law claims. See Id. at 405. Because none of the individuals is liable, Sheriff Nygren cannot be vicariously liable for the actions of his employees. Id.

For the foregoing reasons, the McHenry Defendants' motion for summary judgment is granted. Summary judgment is granted in favor of the McHenry Defendants and against plaintiff on all claims. Plaintiff's motion to file surreply is denied as moot. This case is set for status before this court on October 15, 2012 at 11:00 a.m.

---

1. McHenry County is a necessary party because it would be required to pay any judgment against the sheriff in his official capacity. Carver v. Sheriff of LaSalle County, 324 F.3d 947, 948 (7th Cir. 2003). However, McHenry County cannot be held liable in its own right for any actions taken by the sheriff and no independent proof is necessary or allowed against McHenry County.

2. Plaintiff also sues Centegra Health Systems ("Centegra") and several of its employees (collectively, "Centegra Defendants".) Those defendants also moved for summary judgment and the court has entered an order ("Centegra Order") disposing of that motion. A fairly detailed recitation of the facts appears in the Centegra Order. Additional facts are added here as needed.

3. Plaintiff moves to file a surreply[495]. The court considered the arguments in plaintiff's motion to file surreply as the surreply in deciding the motion for summary judgment.. Plaintiff's motion is denied as moot.

4. For purposes of summary judgment, all reasonable inferences must be drawn in plaintiff's favor. Drach's version is certainly plausible but accepting it requires judging his credibility which cannot be done on summary judgment. Therefore, the court will assume for summary judgment purposes that Hassiba answered "yes" to the "Are you currently extremely depressed or feeling suicidal?" question.

5. Plaintiff argues that a Fourth Amendment reasonableness standard should be applied, as was done in Ortiz v. City of Chicago, 656 F.3d 523 (7th Cir. 2011) where the prisoner had not yet had a judicial determination of probable cause. Plaintiff does not cite any cases where this standard has been applied to immigration detainees and the court finds the due process standard, as applied in Edwards, to be the proper standard.